# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

v.

HARVEY L. ADLER,
　　　　　　*Defendant-Appellant.*

No. 01-4877

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-00-301-AMD)

Argued: September 26, 2002

Decided: October 18, 2002

Before WILKINSON, Chief Judge, WIDENER, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

## COUNSEL

**ARGUED:** Stephen Frederic Brennwald, BRENNWALD & ROB-
ERTSON, L.L.P., Washington, D.C., for Appellant. Kathleen
O'Connell Gavin, Assistant United States Attorney, Baltimore, Mary-
land, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United States
Attorney, Dale P. Kelberman, Assistant United States Attorney, Balti-
more, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Harvey Adler was indicted and tried before a jury for numerous violations of 18 U.S.C. § 1001, a criminal provision of the False Claims Act. A jury found Adler guilty of nine of ten counts of submitting inflated billing invoices to the Housing Authority of Baltimore City. Adler now appeals, challenging two of the trial court's jury instructions, the enhancement of his sentence pursuant to U.S.S.G. § 3C1.1, the trial judge's failure to recuse himself sua sponte, and the sufficiency of the evidence on one of the counts. Finding no merit in any of these claims, we affirm the judgment of the district court.

I.

Harvey Adler ("Adler") was president and sole owner of Adler Services Group ("ASG"), a company that maintained and repaired heating systems. On June 14, 2000, a federal grand jury in the District of Maryland returned an indictment charging Adler and Scott Dower, ASG's former vice-president of operations, with ten counts of making false statements about matters within the jurisdiction of the United States Department of Housing and Urban Development ("HUD") in violation of 18 U.S.C. § 1001. Each count charged Adler and Dower with submitting false and fraudulent invoices that inflated the number of hours worked at specific HUD-funded properties between 1995 and 1997.

The indictment alleged that "from in or before October 1992 and continuing until in or about December 1997," Adler and Dower "devised a plan to defraud HABC and HUD" by submitting inflated billing invoices that contained materially false and fraudulent statements. Dower pleaded guilty and agreed to testify for the government. Jury selection and trial commenced on July 16, 2001.

Between October 1992 and December 1997, ASG sought and was awarded several contracts, commonly called purchase orders, with the Housing Authority of Baltimore City ("HABC"). The contracts called for preventive maintenance and emergency service of oil- and gas-fired residential furnaces at public housing units.* The purchase orders covered the cleaning and inspection of furnaces for a flat rate fee, additional minor repair work on a time and materials basis up to a maximum dollar amount, and emergency or service calls for furnace repair. At trial Thomas Dawson, an HABC employee who was responsible for purchasing supplies and services, testified that any changes to the purchase orders had to be done in writing.

The evidence presented at trial established that Adler directed ASG employees to falsify their labor hours on invoices submitted to HABC at various times throughout the contract relationship. Carl Andrews, the technician who supervised all of the preventive maintenance work from 1992 to 1996, testified that the invoices created by the billing system ASG used until 1996 were usually overcharged. Andrews also testified that HABC was sometimes billed for work that was never completed.

John Palumbo, a former ASG technician, testified about the facts underlying count two of the indictment, relating to a property on Odell Avenue. Palumbo reviewed a number of government exhibits relating to work performed on January 2, 1996. The exhibits showed that thirty hours were billed for work performed on January 2, 1996, but that Palumbo had only worked eight hours that day. Adler could not produce any time sheets or work orders reflecting that any other technicians performed services on that day. Palumbo testified that sometimes other helpers accompanied him to the properties, but that he did not know if anyone accompanied him on January 2.

Adler's defense consisted of two main points: (1) that none of the invoices were overbilled prior to 1996, including the January 2 Palumbo invoice; and (2) that Adler only began overbilling in the fall of 1996 after HABC authorized him to do so. Shortly before the 1996-1997 heating season began, HABC removed the preventive maintenance work from ASG's contract. According to Adler, this

---

*HABC receives its annual funding from HUD.

made it very difficult for ASG to make a profit because the preventive maintenance work constituted such a large part of the contracts. Shortly thereafter, at a meeting with Dower and three other ASG employees, Adler instructed them to start including a two-hour minimum on each billing invoice so that ASG could cover its costs. Dower testified that in November 1997, Diana Bell, an ASG employee who processed invoices, went to Adler with a stack of invoices with inflated hours. Dower heard Bell tell Adler that she did not have any documentation to support the inflated hours, but Adler responded "I don't care what you have to do. This bill is entirely too low." In addition, a number of other ASG employees testified that they falsified their labor hours on work orders and time sheets pursuant to Adler's orders.

Adler testified at trial, but did not deny instructing his technicians to add a two-hour minimum to their work orders. Instead, Adler justified the falsified invoices by testifying that Terry Downey, the comptroller at HABC, had given him permission to inflate hours in order to cover ASG's indirect costs. Adler testified that Downey "directed [him] in the rebilling process to incorporate the indirect labor charges in a line item on the rebilling and then roll those hours into the labor charges." Adler admitted, however, that Downey never put anything to that effect into writing.

Both the government and the defense subpoenaed Downey for the trial, but neither side called him to testify. Downey had refused to speak with defense counsel before trial. The government did, however, produce copies of the government investigators' reports compiled from interviews with Downey. And Downey was physically present in the courthouse at several points during the trial.

After the close of evidence, the government asked the court to instruct the jury that both sides had subpoenaed Downey, and that he was therefore equally available to both sides as a witness. Adler's counsel objected to the instruction because Downey had refused to talk to him before testifying. The district judge told the parties he would only give the instruction if Adler's counsel made some sort of missing-witness argument asking the jurors to draw an adverse inference from the government's failure to call Downey. Adler's counsel did argue this point during his closing. Thus, the court instructed the

jury "that Mr. Downey . . . was equally available to both the defense and the government in this case." Upon Adler's request, the judge also instructed the jury on the "good faith" defense.

On July 26, 2001, the jury returned a verdict of not guilty as to count one and guilty as to the remaining counts two through ten. At sentencing, the district judge determined that Adler committed perjury on the witness stand and therefore enhanced his base offense level two points for obstruction of justice. *See* U.S.S.G. § 3C1.1 (2002). The court then sentenced Adler to forty-one months imprisonment and three years of supervised release for each count, with all nine sentences to run concurrently with each other. The court also ordered Adler to make a restitution of $235,000 and to pay a special assessment of $900.00. Adler now appeals.

## II.

Adler first argues that the district court made two errors in its jury instruction on his good faith defense. The standard instruction on good faith in the context of the crime of false statements is:

> A statement made with good faith belief in its accuracy does not amount to a false statement and is not a crime. This is so even if the statement is, in fact, erroneous. The burden of establishing lack of good faith and criminal intent rests upon the prosecution. A defendant is under no burden to prove his good faith; rather, the prosecution must prove bad faith or knowledge of falsity beyond a reasonable doubt.

Modern Federal Jury Instructions, § 8.01. The district court instructed the jury:

> [T]he defendant in this case contends that the statements which are the subject of this case were made in good faith, in that they were made in reliance upon the authority of the Housing Authority of Baltimore City. A statement made with a good faith belief in its accuracy is not a false statement under the relevant statute. The burden is upon the government to prove that the defendant did not act in good faith.

First, Adler argues that the district court's instruction constituted plain error because the court's use of the word "accuracy" essentially gutted Adler's defense. Since Adler admitted to purposefully inflating the invoices, Adler argues that the good faith defense should not have hinged on Adler's belief in the accuracy of the invoices. Instead, the judge should have instructed the jury that it could find good faith if it concluded that Adler believed he was authorized to submit the inflated, inaccurate invoices. Second, Adler argues that the instruction constituted plain error because it did not inform the jury that the government must disprove good faith beyond a reasonable doubt. We review the instruction for plain error because Adler's trial counsel did not object to the district court's proposed jury instruction on the good faith defense. *United States v. Olano*, 507 U.S. 725, 731-32 (1993).

"[A] defendant in a criminal case cannot complain of error which he himself has invited." *United States v. Herrera*, 23 F.3d 74, 75 (4th Cir. 1994) (quotation omitted). Although the district court's instruction differs slightly from the standard good faith instruction, that difference gives no support to Adler's argument because both Adler's proposed instruction and the actual instruction contain the alleged error that Adler complains of: the use of the word "accuracy." Adler's trial counsel did not even ask the court to change the word "accuracy" to a word or phrase that he believes would have more properly conveyed the good faith defense in this case.

Next, Adler contends that the district court committed plain error by not informing the jury that the government must disprove good faith beyond a reasonable doubt. "When confronted by a claim of an erroneous jury instruction, we do not conduct a search for technical error. Rather, our inquiry is whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb*, 905 F.2d 784, 788-89 (4th Cir. 1990). Here, the district judge instructed the jury at least eight separate times about the need to find each element of the offense beyond a reasonable doubt. Because the judge charged the "beyond a reasonable doubt" standard throughout his charge, we find that taken as a whole the instruction fairly states the controlling law. No plain error occurred.

### III.

Second, Adler argues that the district court erred when it enhanced his sentence two points for obstruction of justice after finding that

Adler committed perjury on the witness stand. *See* U.S.S.G. § 3C1.1. We review the district court's findings for clear error. *United States v. Murray*, 65 F.3d 1161, 1165 (4th Cir. 1995) ("Whether . . . [a defendant] committed perjury is a factual determination made by the sentencing court . . . [that must be] review[ed] for clear error.").

The record supports the district court's finding that Adler willfully gave false testimony concerning a material matter during his trial. Adler's main defense at trial was that he had authorization to submit inflated invoices. However, the evidence suggested — and the jury believed — that Adler's testimony was false. The purchase orders required all modifications, which would certainly include the authorization to institute minimum billing requirements, to be in writing. And Adler produced little support for his testimony that Downey orally authorized Adler to overbill HABC. Adler instructed Dower to inflate invoices. But not once did Adler tell Dower that HABC had authorized the overbilling. Moreover, Adler testified that HABC authorized him to submit the inflated invoices in the fall of 1996 as a direct response to Adler's complaint that ASG would be unable to cover its costs without the preventive maintenance work. But the evidence showed that ASG submitted false invoices beginning at least as early as January 1995, while ASG was still performing preventive maintenance work. And Andrews' testimony that invoices submitted between 1992 and 1995 were usually overcharged supports the jury's verdict. In light of the evidence, the district court's finding that "Mr. Adler lied on the stand on a material matter beyond a reasonable doubt" was not clear error.

## IV.

Third, Adler contends that the trial court abused its discretion by instructing the jury that Downey was equally available as a witness to both parties. We are unpersuaded. Adler knew as much about Downey's potential testimony as the government did: the prosecution produced full copies of its interviews with Downey to the defense well in advance of trial. Adler does not challenge the sufficiency of the government's production and apparently concedes that he and the government stood on an equal footing in terms of the information each possessed about Downey. *See United States v. Abelis*, 146 F.3d 73, 84 (2d Cir. 1998) (witness who refused to speak with defense

counsel was nonetheless adequately "available," because government produced records of its conversations with the witness). Moreover, Downey's physical presence in the courtroom and availability for trial testimony reinforces our conclusion that the trial court did not abuse its discretion in finding that Downey was legally available to both parties.

## V.

We next turn to Adler's contention that the district judge erred by failing to recuse himself sua sponte based on the judge's prior employment relationship with HABC. This contention has no merit. The judge's employment with HABC ended 18 years prior to the commencement of the alleged fraud, and 26 years prior to the actual commencement of trial. Adler does not allege that the district judge knew anything about the facts or people involved in this case. Instead, he contends that because the judge worked for HABC "when he was rather young . . . a bond had surely developed between HABC and the judge." In so alleging, Adler misconstrues the scope of 28 U.S.C. § 455. It is well settled that "litigants are entitled to a judge free of personal bias, but not to a judge without any personal history before appointment to the bench." *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1117 (4th Cir. 1988).

## VI.

Lastly, Adler contends that there was insufficient evidence to support a conviction on count two of the indictment. We have reviewed the evidence with care and find it sufficient to support the jury's verdict.

## VII.

"The purpose of § 1001 is clearly to protect the Government from fraud and deceit." *United States v. Fern*, 696 F.2d 1269, 1273 (11th Cir. 1983). During his eight day trial, Adler had every opportunity to disprove the government's strong evidence of ASG's fraudulent billing practices. His basic complaint is that the jury did not find his defense a credible one. Because we find no merit in Adler's claims, the judgment of the district court is

*AFFIRMED.*